Good morning, everyone. Please be seated. We have a somewhat complicated day today in that we have one case to begin in which Judge Cabranes is joining us from New Haven. Judge Cabranes, can you hear us okay? Yes, indeed. Very good. Good morning. This is the case of United States v. Nasir. We then have a full calendar, which we will address after a brief adjournment. We have two cases on submission and a motion on submission as well. So let us begin right now with United States v. Nasir, No. 16, 373. Thank you. Mr. Newman. Good morning, everyone. James Newman for A Bid, Nasir. What I'd like to just do begin by emphasizing that what I'm asking for this Court to do is just to apply the Supreme Court precedent about the waivers of the right to counsel. I provided a lot of other cases from various jurisdictions to illustrate some different treatment, but I'm really just asking that you do what the Supreme Court said, which is to ensure that a waiver of the right to counsel is made knowingly. And in their language, that means the defendant must have an apprehension of the nature of the charges, the statutory offenses, the range of punishments, possible defenses. And the Court is clear there's a presumption against the waiver of the counsel. Other language they've used is they say the warnings about the pitfalls must be rigorously conveyed. And just telling a defendant that he has a right to counsel simply is not sufficient. So in this case, the issue first arose at a conference in June 2014. What is it he didn't know? What is it he didn't know? What is it he did not know about it? Well, the record doesn't indicate whether he knew the range of offenses, whether he knew about available defenses, whether he knew how this — how representing himself might affect his right — his Fifth Amendment rights. There was extensive pretrial practice here, wasn't there? And you were assigned as advisory counsel. There were status conferences where the district court urged Mr. Nassir to reconsider his decision. And he had many opportunities to see what an attorney could bring to the table. How can we really find his decision to proceed pro se, not knowing or intelligent? Well, what happens here in the beginning — I mean, I'm going to start with the beginning. I'm trying to put it in context to answer your question completely. In the beginning, what the judge does is he says, this is unwise. This is not prudent. He asks another attorney now whether he's spoken to Mr. Nassir. He says, well, I tried to, but he really wouldn't give me his reasoning. So there's no indication that counsel has had any off-the-record discussion about that. And it's at that point, the judge — after the judge says, you know, this is not a good idea, without any kind of elaboration, the judge says, okay. And then — so that's what happens right then. I don't think the government's going to claim that colloquy alone in isolation would be sufficient. So let me put it in the context then. You know, what happened in the weeks preceding this is that the defendant submitted some pro se letters. There were essentially a laundry list of legal terms, such as Fifth Amendment, jurisdiction. One of these letters asks to suppress evidence without identifying the evidence. And so my point is, what the judge was — the judge had these letters. The judge could see that, you know, the defendant is not — does not understand what a real motion entails. So he has that in the back of his mind. I think that in itself should have been placed in an affirmative obligation on the judge to go further. On top of that, this is someone who is from Pakistan. Yes. Can you — can you actually answer Judge Jacob's question? What is it exactly that he did not understand? You're describing circumstances in which the judge could have asked an additional question or pursued, you know, more aggressively the dangers of preceding pro se. But what are you actually saying? Let me — I'll put it this way. Based upon the record — okay, that's what we have, is the record — there's no indication that he understands the statutory penalties, that he understands possible defenses, that he — He told the jury — he told the jury at one point he was facing life in prison. Yes. But, I mean, the judge said, well, you can't say that. Yes, Judge. He knew that. Right. Right, Judge. That's, you know, months, months later. Once he's in the courtroom, he's told that. I don't think that we can just infer from the fact that if someone goes into the court — and actually, I mean, he does act as the lawyer. So in the court, he becomes aware of the evidence, of course, and, you know, and then he makes arguments. But I don't think that's — you know, that is enough to show that he had the understanding, which he really does need at the time that he's making this decision. I mean, if he comes out — You — he had you as advisory counsel. What role did you play? In terms of advising him about his right to counsel? Yeah. Yeah. Well, Judge, during this conference, the initial conference, I was actually out of the room, waiting in jury vertical in another case. You know, I'm going to say what's on the record here. What's on the record is that his — my co-counsel spoke to him, but did not get him to explain his reasoning, and also spoke to his family, who was concerned. There's a reference to that I had a conversation with him, but there's nothing in here about — about the nature of that, you know, and whether he had a full explanation. And I don't think that could substitute for what the judge has to do anyway. So — If he wasn't trusting his lawyers. That's correct, Judge. I mean, and, you know, this is — you know, again, the other thing that's telling about that conference, after the judge has made this decision, then there's a conversation about the scheduling. And — and the prosecutor and the other lawyer, I think they — they reveal that there's a lot of discovery that has yet to be disclosed. Something like two terabytes of discovery that's yet to be disclosed. So the defendant's response — now, this is in June. The defendant wants the date of the speedy trial date, which he says is August, six weeks later. And the defendant's comment is, I want this — this is his quote, irrelevant of the amount of discovery. And, you know, so what the judge does is says, well, I'm not going to do that. You know, that's irresponsible for me to do that. But what that exchange reveals — I mean, you could say, well, he's aware there's discovery. But what it really reveals is he's got no appreciation about the importance of discovery. Does the record give any basis for concluding that he would have made a different decision had the judge explained more about discovery? No. The record doesn't do that. But I do think this is — this is something that's on the burden of the government to show that the waiver was knowing. And if you — you know, the reason I give these other circuits, you know, examples of the kinds of questioning you have — you know, I know we don't have a litmus test here. There's no particular script that needs to be involved. But I did the by way of example to show the kind of searching inquiry that courts make to ensure that someone is really doing this voluntarily. It's not enough. I'll make one other point. Later, months later, the judge makes a comment about how, you know, you're going to be handicapped because of your lack of familiarity with procedure and substance. Well, what I would say is that doesn't really educate the defendant at all into what he has in mind. You know, just the words procedure doesn't convey anything. So there's many things the judge could have done, and that's why I supplied, you know, all these other cases. The judge added, and you've assured me, you're going to continue to think about these things, which means that this — that there may have been some ongoing dialogue here that's not — that I haven't focused on. Well, there's nothing on the record that shows that there was any kind of — that they ever revisited this other than are you sure. You know, the judge did ask that, are you sure, a few times. At one point in a later conference, the judge says, you don't have to answer this if you don't want, but, you know, why are you doing this? And he tells him he doesn't have to answer, and so he says, well, I'm not going to answer. Well, I think the judge should have asked that question. You know, this — if this kind of colloquy is sufficient, then it's hard for me to see what is not sufficient when someone invokes their, you know, right to represent themselves. That's what I'd like to ask the government. And I — I think your time has expired, and you have two minutes for rebuttal. Yes, okay. Thank you, Judge. We'll hear from the government then. May it please the Court. My name is David Kessler. I represent the United States. If I could first just make two quick points about what Mr. Newman said. First of all, the defendant clearly knew the range of punishments. He knew available defenses because he raised them, perhaps not as skillfully as a lawyer would have done, but he raised them very early on. And he knew the evidence against him. He submitted a letter before the status conferences that Mr. Newman was talking about. Focusing on what the judge said. Yes. What's your answer to the rhetorical question? If this is — if this is enough, then what would be insufficient? I mean, how much is there here? You know, if I could take you on my knee, this is extremely unwise. I mean, this is a decision that's pretty crazy that affects his whole life. Yes. So I think we can all agree that proceeding pro se is almost always ill-advised. Yes. It has to be viewed in that context. But this Court has — so to address your question, this Court has laid out a test that looks at the totality of the circumstances. So the sufficiency of the warnings themselves, which I'll get to in one second, do also have to be evaluated in the context of who the defendant is. So that's one thing. You know, the warnings might be more or less applicable depending on the defendant's level of comprehension. And here, not only was the defendant sophisticated and clearly comprehending and able to participate in the proceedings, but judge — the district judge, who's very experienced, had many, many opportunities to observe him and evaluate whether he understood, you know, what was being said and the gravity of the situation. The trouble with these cases is that anybody who decides to defend himself pro se is presumptively stupid or deluded. And therefore, there needs to be something on the record warning. So let me — It's easy to say he's highly sophisticated. If he was highly sophisticated, he would not defend himself. I don't — I don't disagree with that point as far as that goes. Sometimes a defendant may choose to defend himself to make a different point. That's right. And here, clearly — so I want to answer your question, Judge Jacobs. But here, clearly, the defendant wanted to represent himself so he could orchestrate everything and let his voice be heard at every stage during the entire trial. So I think that's — that's the motivation. So it's hard to draw the line as to what would be insufficient. And obviously, I don't think the Court has to draw that line in this case. Certainly, no warnings or advising the defendant that — I think the point of your adversary's pointed rhetorical question is, what's the minimum? Sure. So the minimum is that the defendant has to be warned enough so that the specific defendant can appreciate that this decision is a — is a fraught one, as the district court said. So let me say what I — what I think the record actually shows was done here. Because it's a lot — I think there are repeated warnings over a long period of time, let's say generally, that this course of action is extremely unwise. In addition to that, there are other specific discussions that happen. So, for example, Mr. Newman mentioned the point about the discovery. In the status conference that was being discussed, I think the June one, the Court specifically told the defendant a fair resolution of the charges requires ordinarily that counsel be given the opportunity to review discovery materials before anything happens. That's a specific instruction to Mr. Nasir about the importance of reviewing discovery. And I would say, to some extent, an implicit suggestion that competent counsel has to do that. So that's one thing. In addition, I believe at the next status conference in July, Mr. Nasir's sort of first set of pro se motions was addressed. And the district court spends almost 10 pages of the transcript walking Mr. Nasir through the various motions, including the suppression motion, explaining what the law is, explaining what the problems with those motions are, providing an opportunity. Did he have an opportunity to repair the omission from his motion to suppress, in which he failed to say what he wanted to suppress? Yes. I don't have the page to cite to you, but the district judge says, I'm not going to rule on that now. Come back to me when you know specifically what you want to suppress. And I believe that was addressed later. So the court also explained that there are federal rules of criminal procedure that have to be followed. The court told Mr. Nasir he would have to play by the rules, and had as a small example that Mr. Nasir didn't know how many copies to bring or whether to provide copies to the government. There were repeated discussions about the need to review discovery, and the court's view and the legal advisor's view that reviewing discovery was extremely important. There's obviously the point made to Mr. Nasir that he would not be able to participate in anything related to classified discovery. So on this record, the warnings and instructions to Mr. Nasir were more than sufficient, under this court's totality of the circumstances test, to ensure that his waiver was knowing and intelligent. That doesn't mean that in another case with a different defendant, a different set of warnings might not be sufficient. But there was enough here. Judge Karanis, did you have a question on this topic? I do, yes. Were you counsel for the government in the district court? I was not. You were not. So what can you tell us about what he knew or had to know about the charges against him? He obviously had a copy of the indictment, right? Is there a point at which your predecessor should have pointed out what the charges were and what the arguable defenses would be? So I think taking those questions in reverse order, I don't think the law requires that the government itself say what the charges and the potential defenses are. That said, I can tell you what I know the record shows, which may not be everything, which is the defendant was arraigned, so he was instructed on the charges at the time of arraignment, and he was counseled at that point. There's no dispute about that. The defendant had previously been subject to various proceedings in the United Kingdom that in part related to the same evidence, and he talks about that in this letter I mentioned before to Judge Jacobs. I think it's in February, but it's docket entry 305. In that letter, he lays out pretty well the evidence against him and particularly the core evidence about the email addresses and Mr. Zazie's testimony. So he knew all of that before any of these discussions we're talking about even started. Then during the pretrial process, the long pretrial process that Judge Carney referred to, the government provided a motion in limine about the evidence recovered from Osama bin Laden that again reiterated some of the evidence. And then before the trial, I think it was in a December or January status conference, but it was certainly before the trial started, one of the AUSAs was asked by the judge to summarize the evidence against Mr. Nasir, and it was a three- or four-page summary of the evidence. So I don't think there's a question on this record that Mr. Nasir understood the charges and the evidence against him, and I don't think there's really a suggestion from the defense that that was an issue. I think it was very clear to him in this case, probably much more so than it is in almost any other case where a defendant chooses to proceed pro se. So I hope that answers your question, and we can check the record more if that would be helpful. Could you address the sentencing enhancement, please? Virtually all the other co-conspirators in the Manchester cell I think were deported to Pakistan. Is that right? At least some of them. At least some. So for purposes of the leadership enhancement, so what evidence did the government present that he really directed, organized, or otherwise led the members of the cell? He was one of the younger members. There was someone who was a decade older than he, and there was very little that I saw other than his departure for two weeks to Pakistan and then return. And then I suppose maybe some of Mr. Zazi's testimony, but could you describe what you think supported the application of the leadership enhancement, please? Yes. So let me start with what the district judge said, which was, this is A3183-84 of the record. He said it was a closer call to apply this enhancement than the terrorism enhancement, but it was not a particularly tough one. So given the testimony of Mr. Zazi, the e-mail communications showing that the defendant was the person communicating with the al-Qaeda external operations leadership in Pakistan. He had communications, but was it clear that he was the only person who had communications? I don't think there's anything in the record that there were others e-mailing that e-mail address, but I don't know. I can't specifically answer that question with certainty. I think the focus of the trial was his communications, and I don't remember evidence being presented that there were others in the Manchester cell communicating. There was obviously evidence that the New York people and the Denmark cell were communicating. Was there evidence that they were not communicating, that the others in the Manchester cell? I want to say that the e-mail accounts were searched, and so I want to say that the full contents of the Sana Pakhtana e-mail accounts. But there could, of course, have been other e-mail accounts. There could have been. That was not proving the negative is hard. Numerous members of the Manchester cell were under pretty intense surveillance by the U.K. authorities. That's in the record, and so presumably if there had been a lot of e-mail activity, that might have been observed. But I can't prove the negative. I can just say that the evidence before the district court that he laid out to support the finding was essentially that this defendant was the one trusted by al Qaeda to communicate with the leadership, and given the record evidence about the hierarchical nature of al Qaeda and operational security, it's a fair inference to be drawn, certainly by a preponderance of the evidence, that the person who was trusted to communicate back with the sort of apex of the plot was the person who was in charge or was one of the leaders of the plot in England. Did the — Communications with Sana Pakhtana. Go ahead, Judge Cabranes. Did the judge Deary in in determining an appropriate sentence rely on the findings of the PSR? It's become somewhat routine for a district judge to say that before sentencing that he has reviewed the PSR and relies on information in the PSR. So you incorporate it by reference. Did he incorporate it by reference in some way? I think he did not use the words I'm incorporating it by reference, but he certainly talked about the facts in the PSR. There are a couple of different moments in the sentencing transcript where he refers to the PSR, and, you know, he makes the statement that not every one of the facts is necessarily, you know, my fact. It's the evidence that came at trial. I will also say the statement of reasons indicates that the judge adopted the PSR with some, you know, limited edits that are not relevant to the appeal. So I don't think there's a question that he was adopting the facts of the PSR for purposes of sentencing. And certainly I think the record is crystal clear that he was following those facts on this particular enhancement, which is the only enhancement, really the only procedural error that's been identified by the defense. So I see that my — The record contains a lot of testimony by Mr. Zazi and his co-conspirator about the details of their plan to blow up the New York City subway. And your adversary, the defense, suggests that this was unduly inflammatory, and I have to say it didn't seem to me immediately obvious why there had to be so much detail introduced about plans with regard to New York City when this plot, albeit a terrible plot, concerned actions in England, and Mr. Zazi's testimony was there as kind of a peripheral parallel matter. How can you reassure me that the jury wasn't unduly influenced by those kind of references, which were repeated and extensive? So let me answer that in two ways. The first is I don't agree that Mr. Zazi's testimony was peripheral. The point, especially when you have a cooperating witness who — Parallel is what I meant to say. Yes. But so when you have a cooperating witness, at least generally, whose credibility is very important to the case, it's important to lay out enough evidence so that the jury can believe that person fully. And so in a case like this, laying out all the details and making it clear that what Mr. Zazi was talking about, you know, was to be believed was particularly important given the circumstantial nature of the evidence against Mr. Nasir. It really is proving the parallel that, you know, we know a lot about what happened on the New York side, and we can, you know, draw parallels to what was going on in England. So that quantum of evidence was important to bolster Mr. Zazi and really show that he was a credible witness. I will also point out the defense hasn't really said where the line should have been drawn, and it's hard to conduct a sort of a 403 analysis without some suggestion of where the line was. But so to get to your question about, let's say, the sort of harmlessness of potentially too much, you know, certainly we have all the judge's instructions about how the jury was to focus on the defendant. But I think more important than that, if you look at the government's closing, the government's rebuttal, the defense closing, it's all about the e-mail addresses, you know, the explosives expert and decoding whether these e-mails were about bombs. It's about al Qaeda structure. It starts out with references to blood, blood, blood everywhere. That's true in the first page or two, but it's a plot where they were planning to blow up a shopping mall and kill a lot of people. You know, that's what the case is about. You know, so it's different than, for example, the Al-Moyad case that defense cites, because it's not a situation where, you know, the charges were not a plot to cause a mass casualty attack. I mean, that's exactly what this was about. And so it is true that the government's opening, you know, does refer to blood, but it's, you know, 100 pages of transcript and 90 of those pages, 95 of those pages are a painstaking discussion of, you know, the kind of circumstantial web of evidence. I'll also point out that before the jury was the fact that Mr. Nasir testified and was clearly found not credible again and again and again and again. And so in the harmlessness analysis, there's also that very, very big red flag there. So it's not just that the government's evidence focused on, you know, the kind of the details of the U.K. plot as opposed to the details of the U.S. plot, but there was also the fact that the jury had seen the defendant and didn't believe him. And I don't think they didn't believe him because someone had played an Al-Qaeda recruiting video. You know, I think the record's pretty clear. Thank you very much. Judge Cabranes, did you have anything more? Judge Jacobs? Okay. We'll hear from Mr. Newman again. Thank you. Thank you. Regarding the right to counsel issue, one thing I want to make sure is clear. The defendant is a Pakistani man. He has a — he finished a secondary education in Pakistan and then spent several years in England, U.K., where he was facing extradition charges. And I mention that because although this may not be clear from the record, I'm going to give you my opinion, I think that his decision about proceeding was based on a false understanding about, well, I went to extradition, so I must know everything. And — I'm sorry. I went through extradition. I went through extradition, so therefore I must know everything about how to defend myself. He lost on the issue of extradition because he's here. Exactly, Your Honor. But the — you know, I was thinking about — What about a basis for developing confidence to lose a case? That's my point, Judge. And that's why in this case with that background, I think it should have occurred to the judge maybe to say, you know, this is a different kind of proceeding. We have different laws here. It's not extradition. Just in the way that you might tell a juror during jury selection, if they say they've gone — been a juror in a civil case, they always make a point of saying, well, you know, this is different. It's a criminal case. That's the kind of thing that I think gave — should have given the judge additional reason for concern. He had a false sense of confidence. Exactly. It should have pierced that. Exactly. And with regard to — if I may just address the sentencing issues, you know, we — I was now back on as official counsel at the sentencing process. I submitted very, you know, detailed objections to the PSR. I actually asked for a minor role reduction. The government did not ask for an aggravated enroll enhancement. Probation did that on their own. And, you know, during the — at the sentencing proceeding, you know, I was prepared to go through these factual objections each step of the way. I explained how the defendant did not — there's no evidence he solicited anyone, that he gathered any materials, that he devised a plan, that he conducted surveillance himself. I was going through this, and the judge said, you know, you don't need to go through all of this. And then the quote that my adversary just mentioned, where he gives his explanation, that was actually really in response to my request for a minor role reduction. But all it really says is that, you know, given the testimony and the communication and that there's a hierarchy, we can show that the defendant was, quote, unquote, in charge. Now, I cited a case, Stevens, that specifically says that kind of thing isn't enough. You can't just say because you're in charge, you get a leadership role. You have to show what did you actually do. What supervision did you actually take? And all we really have here is that he was communicating, which I would say to you does not permit an inference sufficient to say that he was actually doing directing. And finally, on the sentencing issue, the judge does indicate at different times that he does not endorse or agree with everything in the PSR. I think it's 3198 of the appendix. He says that's not necessarily my position. Mr. Newman. Yes, Your Honor. If I may. Perhaps you could just describe your role as standby counsel in the chronology. You came in and out and then back in. What exactly was that? All right. So Mr. Brownstein was the lead attorney. He brought me in as second counsel, I think a couple of months before. What time? What time in the legal proceedings? It was in the pretrial stage. Pretrial? Pretrial stage. How pretrial? It was, I think, a couple of months before Mr. Nassir was granted permission to proceed pro se. But you were well aware of the whole record at that point, you and Mr. Brownstein. No question about it. And your own very adequate, more than adequate performance today indicates that you had complete command of the record. Well. As much as you could have. Judge, but at the actual conference where he was granted permission, I was actually not present for the first half of that conference because I was in another courtroom. When I came down, and this record does show. Was Mr. Brownstein there? Mr. Brownstein was there. But I was then told that the judge has made this decision. I mean, the only question is would I be willing to serve as legal advisor. Right. So I stayed in that capacity through the verdict. And then afterwards. Through the verdict. Through the verdict. And it was after. All that time, given your very high level of confidence, you would have described all of this to him. I'm not asking you to. To breach any confidence, but I have. One can't doubt that you would have explained all of this. Anything that concerned you during this whole period, you would have conveyed that to. To Mr. Nassir, right? Well, yes, Judge. And I'm asked questions throughout the process. And I, quite frankly, during the trial itself, there are times, and this is probably not evident on the record, times that I'm telling him you can make an application now. And I'll just make a broader point about that. It's certainly true that throughout the trial, Mr. Nassir is gradually learning more about the process. I think that's true of anyone who goes through trial. But he's got to understand this at some earlier stage. If he finds out in the middle of trial. What I'm getting at is something very simple. He had the benefit of your counsel, of your standby. Call it what you will. You were hovering. You were lurking. You were there. Right? And he knew you were there. Yes, Your Honor. Why, you were there. Yes. But, Judge, there are also cases, which I've cited, that say that the same standards for assessing whether a waiver is knowing applies regardless whether there is a standby counsel. Now, what about his taking the stand? What can you tell us about that? I'm not sure I understand your question. You were there. Yes. He took the stand, right? Yes. I mean, he could have not taken the stand, right? Sure. And he was instructed on that, I'm sure, by you and certainly by Judge Deary, right? Judge, I'm not sure whether Judge Deary made that direction or not. I just don't recall. Let me ask you about, you indicated quite rightly that you had made many comments to the court concerning the pre-sentence report. You used some language, the record will be clear, and you quite rightly described that as thorough or complete or, I mean, you went at it at some length in writing, correct? Yes, Your Honor. And Judge Deary effectively considered all of those. Is there any doubt that he considered all of your suggestions in the pre-sentence report? Frankly, I think I do have some doubt, Your Honor. And the reason I have some doubt is because he did not address these in an individual basis. And, in fact, I complained that probation did not do that either, that their response to my objections were simply, well, the government says this, therefore, we are not changing the report. I told the judge I thought that that was an abdication of responsibility by the probation office. He asked what should they have done. And I think at the minimum, they should have looked at the record and they should have considered each one of the objections because they're supposed to be independent. And the judge, you know, did not address these on an individual basis and I think took Wait a minute. They're not independent. They work for the district court. They are an integral part of the judges of the eastern district, right? That's right. I meant independent of the prosecution. I see. Yeah. So I'm really — I can't tell from this record what the judge — what findings the judge really made regarding the role enhancements. I just can't. Okay. Thank you very much. I appreciate that you have the arguments. Well argued. We'll reserve decision and we'll take a brief adjournment, please.